L.L.N., Plaintiff-Appellant-Cross Respondent,

v.

J. Gibbs CLAUDER, Defendant,

ROMAN CATHOLIC DIOCESE OF MADISON, INC., Defendant-Respondent-Cross Appellant,†

ABC INSURANCE COMPANY, Defendant,

RESEARCH PRODUCTS CORPORATION, a Wisconsin Corporation, Subrogated Party.

Court of Appeals

*No. 95–2084. Submitted on briefs March 11, 1996.—Decided July 25, 1996.*

(Also reported in 552 N.W.2d 879.)

†Petition to review granted.

For the plaintiff-appellant-cross respondent the cause was submitted on the briefs of *David E. McFarlane* and *Melanie E. Cohen* of *La Follette & Sinykin* of Madison.

For the defendant-respondent-cross appellant the cause was submitted on the briefs of *Donald L. Heaney, Kenneth B. Axe* and *Peter A. Martin* of *Lathrop & Clark* of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. L.L.N. sued the Roman Catholic Diocese of Madison, claiming that one of its priests, J. Gibbs Clauder, who was assigned by the Diocese as a hospital chaplain and counselor, used his position to engage her in a sexual relationship. [1]

---

[1] L.L.N. also sued Clauder personally, and that suit continues. This appeal relates only to L.L.N.'s claims against the Diocese.

L.L.N. sought recovery from the Diocese on several grounds, alleging that: (1) the Diocese was negligent in its supervision of Clauder; and (2) the Diocese is vicariously liable for Clauder's actions under (a) the common-law rule of respondeat superior and (b) § 895.70, STATS., which creates a civil cause of action for one incurring "physical, mental or emotional injury" resulting from sexual contact with a "therapist" engaged in psychotherapy or counseling.

L.L.N. appeals from the trial court's order granting summary judgment[2] to the Diocese. The court dismissed L.L.N.'s action on the grounds that there were no disputed issues of material fact and held as a matter of law that: (1) determining the standard of care owed by the Diocese under the doctrines of negligent supervision and respondeat superior would violate the First Amendment prohibition against excessive entanglement of church and state; (2) Clauder's sexual relationship with L.L.N. was beyond the scope of his employment with the Diocese and, as such, the Diocese could not be held liable for his actions on principles of respondeat superior; and (3) because the cause of action provided by § 895.70, STATS., relates to the therapist only, the Diocese cannot be held vicariously liable for Clauder's actions under its terms.[3]

---

[2] While the trial court's order granted the Diocese's motion to dismiss the action for failure to state a claim, because the court accepted and considered affidavits submitted by both parties in support of their positions, we treat the Diocese's motion as one for summary judgment. *See* § 802.06(3), STATS.

[3] The trial court also granted summary judgment for the Diocese on L.L.N.'s claims for breach of fiduciary duty, negligent infliction of emotional distress, pastoral malpractice and institutional liability. L.L.N. does not appeal the summary judgment on these claims.

We first conclude that L.L.N.'s claim against the Diocese for negligent supervision is not barred by the First Amendment and that the parties' affidavits raise disputed issues of fact which must be resolved at trial.[4] We therefore reverse the trial court's order dismissing that claim. We also conclude that, as a matter of law, Clauder's actions in fostering a sexual relationship with L.L.N. are beyond the scope of his employment with the Diocese, and thus the Diocese cannot be held liable for those acts under the rule of respondeat superior.[5] We therefore affirm the order in that respect. Finally, we agree with the trial court that § 895.70, STATS., does not extend liability to the therapist's employer, and affirm the order insofar as it dismisses L.L.N.'s vicarious liability claim under the statute.

## I. Background

In 1984, the Diocese placed Clauder at Meriter Hospital in Madison to serve as a hospital chaplain. While assigned to Meriter, Clauder resided at the parish house of St. Bernard Catholic Church, where Father John Hebl was pastor. Clauder met L.L.N., a member and employee of the Catholic Church, in November 1988, while she was a patient at Meriter. He met with and counseled her with respect to medical and emotional problems she was experiencing. After

---

[4] The Diocese filed a cross-appeal from the trial court's order denying its motion to strike substantial portions of the affidavits filed by L.L.N. in opposition to its summary judgment motion. As we discuss below, we conclude that L.L.N.'s affidavits contain sufficient evidentiary facts to defeat the Diocese's motion on her negligent supervision claim.

[5] Because we so hold, we need not separately consider whether L.L.N.'s respondeat superior claim is barred by the First Amendment.

her release from the hospital, L.L.N. continued to meet with Clauder, eventually joining him for meals and other social activities. She continued to discuss emotional and marital problems with Clauder during this time and they began a sexual relationship in June 1990, when Clauder invited her to visit his family's cottage in northern Wisconsin.

The relationship continued through 1990. They would meet in Clauder's room at St. Bernard, at a hotel and at his family's cottage. At the end of the year, L.L.N. attempted to end the relationship, believing it to be harmful to her, but it resumed shortly thereafter and continued into 1991. Then, after Clauder declined L.L.N.'s request that they meet with someone from Catholic Social Services to discuss their relationship, L.L.N. stopped seeing him.

## II. Standard of Review

When we review a summary judgment, we consider the issues de novo, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Under § 802.08, STATS., summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984).

If a dispute of any material fact exists, or if the undisputed facts raise conflicting interpretations or inferences, summary judgment is inappropriate. *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 512, 383

577

N.W.2d 916, 918 (Ct. App. 1986). Issues of fact are not decided on a motion for summary judgment. The process is not a " 'short cut to avoid trial' "; indeed, the methodology we apply to such motions is designed to prevent trial by affidavit or deposition. *Id.* at 511, 383 N.W.2d at 917-18 (quoted source omitted). The party moving for summary judgment has the burden of establishing the absence of factual issues, and we resolve all doubts in this regard against that party. *Id.* at 512, 383 N.W.2d at 918. It is only when the facts, and reasonable inferences from the facts, are not in dispute that we consider the legal questions raised by the motion. *Id.* at 511, 383 N.W.2d at 917.

### III. Is L.L.N.'s Negligent Supervision Claim Barred by the First Amendment?

The Establishment Clause of the First Amendment to the United States Constitution prohibits the enactment of any law "respecting an establishment of religion, or prohibiting the free exercise thereof."

The United States Supreme Court has said that the clause is intended to protect against "three main evils": "[governmental] sponsorship, financial support, and active involvement . . . in religious activity." *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971). At issue in *Lemon* were statutes allocating public funds to pay parochial school teachers who taught secular subjects. The Court struck down the statutes as "foster[ing] 'an excessive government entanglement with religion' " in violation of the clause. *Id.* at 613 (quoted source omitted).

The clause does not grant religious organizations blanket immunity from suit, but it does prohibit civil courts from adjudicating controversies that would require them to interpret or decide matters of religious

doctrine or faith. *Olston v. Hallock*, 55 Wis. 2d 687, 696-97, 201 N.W.2d 35, 39-40 (1972). In *Olston*, the Wisconsin Supreme Court held that, under the clause, the decision of an Episcopal diocese to discharge a priest because of "differences" between the priest and the congregation was "outside the province of judicial review." The court explained that to inquire into the reasons for, and details of, the discharge " ' "would be inconsistent with complete religious liberty untrammeled by State authority" ' " mandated in the Constitution. *Id.* at 698, 699, 201 N.W.2d at 40-41 (quoted sources omitted). In so holding, the court cited several U.S. Supreme Court decisions recognizing that the clause grants to religious organizations " 'a spirit of freedom . . ., an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Id.* at 697, 201 N.W.2d at 39-40 (quoted source omitted).

The trial court held that these principles barred L.L.N.'s claim against the Diocese for negligent supervision of Clauder, concluding that the determination of the standard of care owed by the Diocese in supervising one of its priests would directly involve the court in religious matters.

L.L.N. argues that her claims will not impermissibly entangle the state in religious matters because her complaint alleges only that the Diocese negligently supervised Clauder in his "placement . . . as a hospital chaplain where he engaged in secular counseling and provided therapy to [L.L.N.]." She also argues, as she must to sustain her claim, that the Diocese knew or should have known that Clauder was likely to use his office as hospital chaplain to sexually exploit women because, she contends, Hebl knew that Clauder had

developed a similar relationship with another woman in the recent past.[6]

The Diocese, citing *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780 (1995), *cert. denied*, 116 S. Ct. 920 (1996), maintains that a claim for negligent supervision involving a religious organization is prohibited by the First Amendment as a matter of law. In *Pritzlaff*, the plaintiff sued John Donovan, a Roman Catholic priest, claiming that he had used his position as a priest to coerce her into a sexual relationship many years earlier. Like L.L.N., she sought damages for the injuries allegedly incurred as a result of the affair. She also claimed the Diocese was negligent in hiring, retaining and supervising Donovan, asserting, again like L.L.N., the Diocese knew or

---

[6] According to depositions L.L.N. submitted to support this contention, Clauder frequently met with the woman, T.E., sometimes sharing meals with her at the rectory and having her stay overnight in his room at St. Bernard. Their relationship ended when Hebl discovered Clauder and T.E. together in Clauder's private room at the rectory one evening. Hebl said that he heard Clauder call for help at approximately 9 p.m., and when he arrived at Clauder's room, he saw T.E. on her back on the floor and Clauder straddling her body and holding her hands down. Clauder was bleeding from a bite on his wrist.

At the time of this incident, Hebl said he was aware that Clauder spent time with T.E. and had traveled to Japan to visit her but did not question Clauder or T.E. about the incident and did not report it to the bishop because he "drew no inference of sexual impropriety" from it. He testified in a later deposition, however: "I think with the circumstances under which this happened, there could be th[e] possibility [of sexual involvement] . . . but . . . I would never, never accuse him of it." He also said that the incident "was such a disappointment to me, I just wanted to forget about it."

should have known of Donovan's conduct and propensities in that regard.

Although the court in *Pritzlaff* upheld the trial court's dismissal of the plaintiff's claim as barred by the statute of limitations, it went on to discuss whether a claim for the negligent hiring, retention and supervision[7] of clergy may be maintained against religious orders under the Establishment Clause. The court saw little question that the hiring of a priest went beyond judicial scrutiny because the " 'ministerial selection policy . . . is [so] "infused with the religious tenets of the particular sect," ' " that allowing courts to determine what makes one competent to serve within a religious order would necessarily require an "interpretation of church canons and internal church policies and practices." *Id.* at 326, 533 N.W.2d at 790 (quoted sources omitted).[8]

---

[7] In *Pritzlaff*, the supreme court stated that although it had not determined whether a cause of action for negligent supervision exists in Wisconsin, it would assume so for the purposes of the decision in that case. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 325-26, 533 N.W.2d 780, 789 (1995), *cert. denied*, 116 S. Ct. 920 (1996). We do the same here. The parties have not briefed the issue, and the Diocese has not argued that it is entitled to summary judgment on the basis that no cause of action exists. For purposes of this appeal, we will thus assume, without deciding, that a cause of action for negligent supervision exists in Wisconsin.

[8] Summarizing a long line of First Amendment cases involving the selection of clergy, the court concluded that " '[f]reedom to select the clergy . . . must now be said to have federal constitutional protection as part of the free exercise of religion against state interference.' " *Pritzlaff*, 194 Wis. 2d at 327, 533 N.W.2d at 790 (quoting *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116 (1952)).

The *Pritzlaff* court felt differently about a claim for negligent supervision, considering it to be "a closer issue" because under limited circumstances a court might be able to decide a negligent supervision issue "without determining questions of church law and policies." *Id.* at 328, 533 N.W.2d at 791. The court warned, however, that the inquiry necessary for trying claims of negligent supervision would be "prohibited by the First Amendment under most if not all circumstances." *Id.* (footnote omitted). This is so, said the court, because

> "[a]ny inquiry into the policies and practices of the church . . . in hiring or supervising their clergy raises . . . First Amendment problems of entanglement . . . which might involve the court in making sensitive judgments about the propriety of the church['s] . . . supervision in light of their religious beliefs. . . .
>
> It would therefore . . . be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause."

*Id.* at 329, 533 N.W.2d at 791 (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 332 (S.D.N.Y. 1991)).

We do not believe that *Pritzlaff* precludes L.L.N.'s claims as a matter of law. Rather, L.L.N.'s claims present one of the "limited circumstances" in which a court might be able to inquire into a negligent supervision claim without fostering an impermissible entanglement in church, policy, law and governance—without, in the words of *Pritzlaff*, " 'making sensitive judgments

about the propriety of the church['s] . . . supervision in light of their religious beliefs.' " *Id.* (quoted source omitted).[9]

The Diocese does not contend that Clauder's relationship with L.L.N. has any grounding in Roman Catholic doctrine or faith. L.L.N.'s affidavits indicate that he was advising and counseling her with respect to a variety of medical, emotional and marital difficulties she was experiencing throughout their relationship. She bases her negligent supervision claim not on any failure on the Diocese's part to supervise or monitor Clauder with respect to any of his sectarian or priestly duties, but on his actions as a counselor/therapist. She cites the RESTATEMENT rule that a principal may be held liable for negligence in supervising an employee when "[t]he principal . . . has reason to know that the . . . agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to

[9] The Diocese, citing *Pritzlaff*, also argues that it cannot be held liable for negligent supervision of Clauder because Clauder and L.L.N. committed adultery, which is a crime in Wisconsin. *See* § 944.16, STATS. The *Pritzlaff* reference is to *dicta* in the opinion noting the existence of a single case, *Tichenor v. Roman Catholic Church of the Archdiocese,* 32 F.3d 953, 960 (5th Cir. 1994), which holds that an employer cannot be held liable for negligent supervision under Mississippi law when an employee engages in independent criminal conduct which causes the plaintiff's injuries. *Pritzlaff,* 194 Wis. 2d at 328 n.10, 533 N.W.2d at 791. The court did not decide the issue in *Pritzlaff*, however, and the Diocese has provided us with no other citations in support of its brief "footnote" argument on the point. As we conclude above, *Pritzlaff* does not stand for the proposition that negligent supervision claims in cases such as this are *per se* violative of the Constitution.

him,"[10] and she contends that the Diocese—knowing through the observations of the pastor of the rectory in which Clauder resided that he had previously engaged in highly suspicious activities with another woman within the rectory—had notice of the risks posed by his assignment as a hospital chaplain/therapist and a duty to act on that knowledge.

In *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993), *cert. denied*, 114 S. Ct. 2153 (1994), the plaintiff sued the Episcopal Diocese of Colorado, alleging, among other things, that it had been negligent in supervising a priest who had used his counseling relationship with her to initiate a sexual liaison. She presented evidence showing the diocese knew that a psychological examination of the priest indicated he had "a sexual identification ambiguity," problems with depression, low self-esteem and difficulties dealing with superior authorities. *Moses*, 863 P.2d at 328.

---

[10] RESTATEMENT (SECOND) OF AGENCY § 213 cmt. d (1957). Section 213 reads as follows:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> . . . .
>
> (c) in the supervision of the activity. . . .

The Diocese suggests that § 213 of the RESTATEMENT does not apply because "Section 213 is not expressly applicable to churches," but it offers no authority supporting the proposition that the RESTATEMENT or any other legal text or source is inapplicable to churches unless specifically stated. We need not consider the argument further. *See Racine Steel Castings v. Hardy*, 139 Wis. 2d 232, 240, 407 N.W.2d 299, 302 (Ct. App. 1987), *rev'd on other grounds*, 144 Wis. 2d 553, 426 N.W.2d 33 (1988) (stating court of appeals does not consider arguments unsupported by references to legal authority).

Given that information, the court held the jury could properly find that the diocese "should have been alert to the possibility of problems with [the priest] and taken adequate steps to insure [he] was not in a position where he could abuse the trust he enjoys as a priest conducting counseling." *Id.* at 329.

The *Moses* court rejected the diocese's claim that First Amendment considerations rendered the plaintiff's claims nonjusticiable, beginning its discussion by noting that the principle represented by the long line of cases interpreting the Establishment/Free Exercise Clause is that "courts must not become embroiled in disputes involving a religious organization if the court would be required to interpret or weigh church doctrine." *Id.* at 320. The court, noting the rule that courts may "apply the neutral laws of the state to religious organizations" as long as that application does not involve "issues of religious doctrine and practice," concluded:

> [The plaintiff]'s claims in this case do not involve disputes within the church and are not based solely on ecclesiastical or disciplinary matters which would call into question the . . . court's power to render a judgment against the defendants. Our decision does not require a reading of the Constitution and Canons of the Protestant Episcopal Church or any other documents of church governance. Because the facts of this case do not require interpreting or weighing church doctrine and neutral principles of law can be applied, the First Amendment is not a defense against [plaintiff]'s claims.

*Id.* at 321.

We think the same is true here. To resolve L.L.N.'s claim, a factfinder need not interpret or weigh church doctrine but merely determine, under neutral rules of

585

law, whether, under the facts, a reasonable person would know or should have known that Clauder's placement as hospital chaplain was likely to result in harm.[11]

We conclude, therefore, that L.L.N.'s cause of action alleging that the Diocese was negligent in supervising Clauder is not barred by the First Amendment.

Given that conclusion, we still must consider whether summary judgment may properly be entered on the record before us. We think not. As we have discussed above, summary judgment is appropriate only when there is no dispute as to the material facts of the case. The Diocese claims it is "uncontroverted" that it had no way of knowing that Clauder presented a risk of sexual exploitation from the prior incident involving another woman because, according to his own deposi-

---

[11] The Diocese also argues that the negligent supervision claim is barred by the First Amendment based on cases "refusing to recognize a cause of action for clergy malpractice because of constitutional issues." *See Dausch v. Rykse*, 52 F.3d 1425, 1432 (7th Cir. 1994); *Nally v. Grace Community Church*, 763 P.2d 948, 960 (Cal. 1988), *cert. denied*, 490 U.S. 1007 (1989); *Destefano v. Grabrian*, 763 P.2d 275, 285 (Colo. 1988); *Roppolo v. Moore*, 644 So. 2d 206, 208 (La. Ct. App. 1994).

The cases cited by the Diocese are distinguishable. Claims for "clergy malpractice" are constitutionally problematic because such a cause of action would require determining the "duty of care" owed by clergy to their parishioners, a determination which would "necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity." *Nally*, 763 P.2d at 960. Here, L.L.N.'s claim does not depend on a breach of a duty of care, but upon whether a reasonable person would have recognized that Clauder posed a risk of sexual exploitation in his placement as hospital chaplain.

tion, Hebl "never thought that anything sexual had occurred between Clauder and the woman." We disagree.

First, as we note above, *supra* note 6, Hebl also acknowledged in his deposition that his observation of Clauder and T.E. suggested at least the "possibility" of sexual involvement. Second, under RESTATEMENT (SECOND) OF AGENCY § 213 (1957), whether an employer has cause to know that an employee is likely to harm others is a question of fact, to be evaluated under a "reasonable person" standard. *See Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1221 (Alaska 1991); *Mrozka v. Archdiocese of St. Paul & Minneapolis*, 482 N.W.2d 806, 813 (Minn. Ct. App. 1992). In other words, it is a jury question inappropriate for resolution on summary judgment.

In a brief, two-sentence argument, the Diocese contends that regardless of the inferences that may be drawn from Hebl's testimony, his knowledge cannot be imputed to it because Hebl was "not employed by the Diocese [but rather] was the pastor at St. Bernard's Parish, Inc., a separate corporation." "Because Hebl was not a part of the Diocese corporate entity," claims the Diocese, his knowledge cannot be imputed to the bishop or other officials.

L.L.N. points out, however, that Hebl himself acknowledged that, like all priests, he is "responsible directly to the bishop of the diocese of Madison." Hebl's testimony is consistent with an affidavit from Bishop Wirz describing the hierarchical nature of the church,

587

whereby authority runs from the head of the Diocese, the bishop, to pastors such as Hebl.[12]

Such a brief record is inadequate for us to determine—as the Diocese would have us do—that Hebl's position in the church hierarchy would not warrant imputing his knowledge to the Diocese as a matter of law. The brief factual assertions regarding his status both as a pastor at a church, with a corporate entity separate from that of the Diocese, and as a pastor/priest with responsibilities running directly to the bishop raise inferences going both ways on the issue, and we believe their resolution is best left to the factfinder, rather than the appellate court.[13]

---

[12] The Diocese submitted the affidavit of George O. Wirz, who is the auxiliary bishop of the Roman Catholic Diocese of Madison.

[13] The Diocese, citing *Strock v. Pressnell*, 527 N.E.2d 1235 (Ohio 1988), also argues that because the trial court dismissed all of L.L.N.'s claims against Clauder personally—with the exception of the claim under § 895.70, STATS.—and L.L.N. has not appealed the claims against Clauder, she cannot maintain a cause of action for negligent supervision against the Diocese.

*Strock* held that when the personal claims against the offending clergyman had been dismissed as not cognizable in Ohio courts, the plaintiff's negligent supervision claim against the church could not stand because "an underlying requirement in actions for negligent supervision . . . is that the employee is individually liable for a tort . . . against a third person." *Strock*, 527 N.E.2d at 1244.

*Strock*, of course, is not precedential in Wisconsin; nor are we persuaded that the Ohio court's reasoning has any application here. There has been no adjudication that Clauder did not act as L.L.N. alleges. It has not been held, nor has the Diocese persuaded us, that her allegations with respect to Clauder cannot state a cognizable claim under Wisconsin law. There is

## IV. Respondeat Superior

The trial court also held that L.L.N.'s respondeat superior claim must fail under the Establishment Clause. We need not undertake the constitutional analysis with respect to this claim, however, for we are satisfied that Clauder, a priest/counselor who, in the course of a counseling relationship, initiated sexual contact with a client, was, as a matter of law, acting outside the scope of his employment by the Diocese.

"Under the doctrine of *respondeat superior* an employer can be held vicariously liable for the negligent acts of his [or her] employees while they are acting within the scope of their employment." *Shannon v. City of Milwaukee*, 94 Wis. 2d 364, 370, 289 N.W.2d 564, 568 (1980); *see* RESTATEMENT (SECOND) OF AGENCY § 219(1) (1957). An employee's or agent's conduct is not within the scope of employment if it is either "different in kind from that authorized . . . [by] the master," *Scott v. Min-Aqua Bats Water Ski Club, Inc.*, 79 Wis. 2d 316, 321, 255 N.W.2d 536, 538 (1977), or "if it is too little actuated by a purpose to serve the employer or if it is motivated entirely by the employee's own purposes." *Olson v. Connerly*, 156 Wis. 2d 488, 499-500, 457 N.W.2d 479, 483 (1990). Thus, if the employee "step[s] aside from the prosecution of the employer's business to accomplish an independent purpose of his or her own," the employee is acting outside the scope of his or her employment. *Id.* at 500, 457 N.W.2d at 483.

---

nothing in this record, or in the law, to suggest that no reasonable jury could determine that the Diocese negligently supervised Clauder, despite the particular procedural posture of this case.

In *Block v. Gomez*, 201 Wis. 2d 789, 793-74, 549 N.W.2d 783, 785 (Ct. App. 1996), we held that a therapist/counselor who initiated sexual contact with a client in the course of her therapy, knowing that the clinic in which he was employed forbade such conduct, was acting outside the scope of his employment as a matter of law.

The same is true here. It is undisputed Clauder knew that using his office as a counselor to initiate a sexual relationship with L.L.N. constituted forbidden conduct—both as an agent of the Diocese and as a Roman Catholic priest bound by a vow of celibacy. We conclude that, under *Block*, the Diocese cannot be held liable for Clauder's actions on grounds of respondeat superior.

Finally, L.L.N. argues that even if Clauder's actions fall outside the scope of his employment as a matter of law, the Diocese may still be held vicariously liable under RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) (1957).[14] That section states that an employer is not subject to liability for an employee's acts outside the scope of his or her employment *unless:*

---

[14] The Diocese argues that L.L.N. waived this argument because she did not raise it before the trial court on the motions for summary judgment. Although we will not generally review an issue raised for the first time on appeal, *Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140, 145 (1980), we will permit a new argument to be raised on an issue which was raised below. *State v. Holland Plastics Co.*, 111 Wis. 2d 497, 504-05, 331 N.W.2d 320, 324 (1983). L.L.N. argued in the trial court that summary judgment was improper on the vicarious liability claim, and we reject the Diocese's contention that the argument was waived.

(d) the [employee] purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

L.L.N. has not put forth any facts indicating that Clauder was acting on behalf of the Diocese in initiating the sexual relationship with her. She claims only that he was aided in sexually exploiting her by the Diocese's act of placing him in a "specialized position as hospital chaplain where emotionally vulnerable patients [could] be exploited."

Wisconsin has not yet applied § 219(2)(d).[15] L.L.N. argues, however, that other courts have employed it to impose liability "where an employer provided the employee with the opportunity to engage in misconduct which results in injury to another," and that this case is "a textbook example for finding liability under . . . sec. 219(2)." The cases L.L.N. cites, however, bear out neither the underlying proposition nor her conclusion. Two of the cases simply cite or quote the RESTATEMENT rule without explanation or any attempt to apply it to the facts.[16] In another, the citation appears in one of four separate nonmajority opinions issued by members

---

[15] The section was discussed in a dissenting opinion in *Olson v. Connerly*, 151 Wis. 2d 663, 680, 445 N.W.2d 706, 713 (Ct. App. 1989), *aff'd*, 156 Wis. 2d 488, 457 N.W.2d 479 (1990). It was not argued by the parties in that case, however, or mentioned in the majority opinion.

[16] *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1418 (10th Cir. 1987) (mentioning the section briefly in one paragraph in fourteen-page opinion); *Graves v. Wayne County*, 333 N.W.2d 740, 742-43 (Mich. Ct. App. 1983) (mentioning the section in a quoted excerpt from another case, but including no separate analysis by the deciding court).

of a seven-member court,[17] and the remaining three—the only ones even peripherally relevant here—involve harassment and discrimination in the workplace by the plaintiffs' supervisors, who used the authority specifically delegated to them by the employers—authority to fire and to control the work environment—to harass and discriminate against the plaintiffs.[18] This is not a situation, however, in which a supervisor uses the "apparent authority" of the employer—the specific powers delegated by the employer—to force unwanted contact with a subordinate, as in the cited cases. Rather, it is a case in which the employee (Clauder) is alleged to have sexually exploited a third party, not through use of authority delegated to him by the Diocese, but through his own actions undertaken in the course of providing professional services to that party. Section 219(2) does not change our conclusion that the Diocese is not vicariously liable for Clauder's acts.

---

[17] *McCann v. State Dep't of Mental Health*, 247 N.W.2d 521, 526 (Mich. 1976).

[18] *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559-60 (11th Cir. 1987) (involving a supervisor who, using authority delegated by employer, fired plaintiff for refusing his sexual advances); *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401, 407 (7th Cir. 1988) (calling § 219 a rule of "apparent authority," and citing it for the proposition that employer cannot be liable for supervisor's discriminatory firing of plaintiff unless it knew or should have known of the supervisor's discriminatory motive); *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 114 S. Ct. 2693 (1994) (holding an employer can be liable when a supervisor, using authority specifically delegated to him by employer, created a "discriminatorily abusive work environment" to sexually harass the plaintiff).

## V. *Vicarious Liability under § 895.70, STATS.*

Finally, L.L.N. argues that the Diocese can be held vicariously liable for Clauder's actions under § 895.70(2)(a), STATS., which provides as follows:

> Any person who suffers . . . a physical, mental or emotional injury . . . resulting from . . . sexual contact with a therapist who is rendering or has rendered to that person . . . counseling . . . has a civil cause of action against the psychotherapist for all damages . . . arising out of or caused by that sexual contact.

The term "therapist" is defined by the statute to include a "member of the clergy . . . who performs or purports to perform psychotherapy." Section 895.70(1)(e).

We construe statutes to ascertain and give effect to the intent of the legislature. *DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891, 893 (1985). Our first resort is to the language of the statute, and where that language is plain on its face, we simply apply it to the facts; "[w]e do not look beyond the plain and unambiguous language" of a statute. *Vogel v. Grant-Lafayette Elec. Coop.*, 195 Wis. 2d 198, 220, 536 N.W.2d 140, 149 (Ct. App. 1995), *rev'd on other grounds*, 201 Wis. 2d 416, 548 N.W.2d 829 (1996). Another rule of statutory construction is relevant to our inquiry. Section 895.70(2)(a), STATS., creates a cause of action for individuals injured by sexual relations with a therapist—a cause of action that does not require proof of negligence. It is thus in derogation of common-law negligence principles and, as such, must be strictly con-

strued. *Kwiatowski v. Capitol Indem. Corp.*, 157 Wis. 2d 768, 776, 461 N.W.2d 150, 153 (Ct. App. 1990).[19]

The language of the statute plainly grants the injured party a cause of action "*against the [ ]thera-pist.*" It says nothing about employer responsibility for the offending acts. Acknowledging this, L.L.N. argues that, despite the absence of any such indication on the face of the statute, the legislature must have intended it to impose liability on religious organizations for the acts of their clergy because "[i]f the acts of a therapist who happens to be a priest cannot be imputed to his employer, the statute . . . becomes meaningless since it is well known that priests do not have independent financial resources." It is really an argument that, for reasons of public policy, we should read language into the statute that is not there.[20]

---

[19] L.L.N. argues that, under similar circumstances, a federal district court held a school district strictly liable for a teacher's sexual abuse of a student. *See Leija v. Canutillo Indep. Sch. Dist.*, 887 F. Supp. 947 (W.D. Tex. 1995). In *Leija*, the plaintiff sued the school district under 20 U.S.C. §§ 1681-88 (Title IX), which creates a cause of action for intentional sex discrimination in public schools. *Leija* is distinguishable. There the district court, after concluding that the sexual abuse of a student constituted intentional sex discrimination under the statute, went on to hold that precedent existed for imputing liability to the employer in the context of other federal civil rights statutes. *Leija*, 887 F.2d at 952, 954. In addition, the court in *Leija* held that sexual abuse of students in public schools presented a special type of case that warranted imputing liability to the employer. *Id.* at 953-56. L.L.N. has not referred us to any similar statutes, special circumstances or other authority indicating that the Wisconsin Legislature intended § 895.70, STATS., to sweep so broadly.

[20] In a similar vein, she urges us to hold the statute applicable to the Diocese as a means of encouraging it (and,

As we have said, our inquiry into the legislature's intent in enacting a statute ends if the language it has chosen is plain and unambiguous—as is, we believe, the language of § 895.70(2)(a), STATS.—and L.L.N. does not argue to the contrary. As for her argument that we should read the statute differently for reasons of public policy, it has long been recognized that the judiciary is far from the "preferred branch of government to enunciate general rules of public policy." *In re Guardianship of Eberhardy*, 102 Wis. 2d 539, 576, 307 N.W.2d 881, 898 (1981). The supreme court has said, for example, that "determination of public policy is a matter primarily for the legislature, and when the legislature has clearly stated its policy in the form of a statute . . . that determination is binding on the . . . courts." *Sinclair v. H&SS Dep't*, 77 Wis. 2d 322, 335, 253 N.W.2d 245, 251 (1977). It follows that public-policy considerations regarding the wisdom of a statute are for the legislature to determine, just as the unfairness of a statute is for the legislature to cure. *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 186, 189, 290 N.W.2d 276, 282, 284 (1980).

## VI. The Diocese's Challenges to L.L.N.'s Affidavits

As indicated, the Diocese moved the trial court to strike part or all of the several affidavits submitted by L.L.N. in opposition to the Diocese's motion for summary judgment. The trial court denied the motion and the Diocese cross-appeals, arguing that the affidavits should be struck—and presumably not considered on

---

presumably, other religious organizations) "to heighten [their] vigilance . . . [and cause them] to actively take steps to prevent this type of sexually exploitative conduct."

this appeal—because they include expert opinion, hearsay and conclusory statements.

■■■

Section 802.08(3), STATS., requires affidavits supporting or opposing motions for summary judgment to be based on the affiants' "personal knowledge" and to include only "evidentiary facts." Affidavits, or portions thereof, that do not comply with § 802.08(3) are to be disregarded by the court in determining whether summary judgment should be granted. *Hopper v. City of Madison*, 79 Wis. 2d 120, 130, 256 N.W.2d 139, 143 (1977).

Because we concluded that L.L.N.'s claims of respondeat superior and vicarious liability under § 895.70, STATS., are barred as a matter of law, we need not consider whether we should disregard any of the affidavits or portions thereof that were submitted in support of those claims.[21] Of the remaining affidavits, we need only consider those necessary to show a dispute of material fact (or conflicting inferences from those facts) sufficient to defeat summary judgment on the remaining claim for negligent supervision.[22]

---

[21] For instance, the Diocese challenged the affidavits of several mental health professionals stating their opinion that Clauder was acting as a "therapist" in counseling L.L.N., and was engaged in "psychotherapy" with her when their affair began. The Diocese challenges these expert-opinion affidavits only in the context of whether Clauder was acting as a "therapist" within the meaning of § 895.70(2)(a), STATS. Because we have held that § 895.70 cannot, as a matter of law, impose liability on the employer of the person initiating the prohibited sexual contact, whether Clauder does, or does not, qualify as a "therapist" in the psychological or psychiatric sense of the term is immaterial.

[22] We also note that the Diocese challenges a significant portion of material in the affidavits which support claims that

Opposing the Diocese's summary judgment motion to dismiss her negligent supervision claim, L.L.N. submitted affidavits from two mental health professionals indicating the Diocese either knew or should have known that sexual exploitation by members of the clergy is a significant problem in the church world and can cause debilitating psychological harm to the victims. She offered the affidavits in support of her argument that there was a material dispute of fact with respect to her claim.[23] The Diocese challenges these statements on grounds that they "invade the province of the finder of fact," and that they are matters of observable fact, not expert opinion.

We previously concluded that Hebl's deposition describing the incident with T.E., combined with the conflicting inferences which may be drawn from the testimony regarding the imputability of Hebl's knowledge to the Diocese, raises sufficient factual issues to defeat the motion for summary judgment on the negligent supervision issue. Thus, whether we could properly rely on the affidavits of L.L.N.'s experts asserting that the Diocese should have known that sexual exploitation of parishioners by clergy was a risk is irrelevant.[24]

---

were dismissed by the trial court and not appealed. We, of course, need not examine these to determine whether they should be disregarded.

[23] The Diocese submitted the affidavit of Auxiliary Bishop George Wirz, in which he states he had "no knowledge of any inappropriate sexual conduct or proclivity on the part of [Clauder] toward inappropriate sexual conduct."

[24] The Diocese also objects to an affidavit of L.L.N.'s counsel incorporating several articles describing problems of sexual exploitation within the Catholic Church which were submitted

The Diocese concludes by listing some thirty averments contained in L.L.N.'s affidavit describing her relationship with Clauder, and stating, without any elaboration or explanation, that they should be stricken as containing "[c]onclusory and hearsay statements." The Diocese tells us it chose "not [to] explain[ ] specifically how each of these [30] averments is conclusory or states ultimate facts since it believes that the court can make the determination from a reading of each statement." This is a nonargument that leaves us to our own devices to develop the Diocese's position with respect to each of the thirty statements and then undertake our own unguided analysis of those positions. It is not for us to develop arguments for the parties, and when points are not specifically argued, but only broadly stated, we will not, as a rule, consider them. *Fritz v. McGrath*, 146 Wis. 2d 681, 686, 431 N.W.2d 751, 753 (Ct. App. 1988).[25] We see no reason to

---

to show that the Diocese knew, or should have known, that sexual exploitation by clergy was an issue deserving its attention. The Diocese challenges the affidavit and accompanying materials as hearsay. Because, as we stated, we are satisfied the Hebl deposition is sufficient to raise a disputed issue of material fact on the negligent supervision issue, we need not (and do not) consider counsel's affidavit on this appeal.

[25] After receiving L.L.N.'s brief arguing that we should ignore the Diocese's challenges to her affidavit as inadequately briefed, the Diocese filed a reply brief in which it does argue some specific points. It is a well-established rule of appellate practice that the court will not consider arguments raised for the first time in a reply brief, *Northwest Wholesale Lumber v. Anderson*, 191 Wis. 2d 278, 294 n.11, 528 N.W.2d 502, 508-09 (Ct. App. 1995), because doing so "thwart[s] the purpose of a brief-in-chief, which is to raise the issues on appeal, and the purpose of a reply brief, which is to reply to arguments made in

depart from that rule in this case and we reject the Diocese's cross-appeal.[26]

We reverse the summary judgment dismissing L.L.N.'s claim against the Diocese for negligent supervision of Clauder, and remand to the trial court for

a respondent's brief." *Verex Assurance, Inc. v. AABREC, Inc.,* 148 Wis. 2d 730, 734 n.1, 436 N.W.2d 876, 878 (Ct. App. 1989).

[26] The remaining, unchallenged portions of L.L.N.'s affidavit describe the basics of her Catholic beliefs, the impressive and important status priests enjoy in the church, and her lifelong reliance on them for "direction" whenever she experienced "personal issues of an emotional or spiritual nature." They discuss the medical and emotional problems she was experiencing when she met Clauder in the hospital and how she began to discuss her problems with him, both while hospitalized and after her release. They relate how the two of them soon began meeting at restaurants, in her home, and eventually at restaurants and bars, and how Clauder's conversations began to take on explicit sexual overtones. And they describe how the relationship soon moved to physical intimacy and then to intercourse "on a regular basis." Even if we were to disregard all of the statements challenged by the Diocese, we are satisfied that L.L.N.'s affidavit states sufficient evidentiary facts to show the existence of a material factual dispute with respect to the issue or issues remaining to be tried.

Beyond that, in the absence of any explanation or argument to the contrary, we are not persuaded that the Diocese's challenges to L.L.N.'s affidavit have merit—at least with respect to her statements: (1) relating the degree of trust she reposed in Clauder as a person helping her through "difficult times" and a series of "very personal emotional issues"; (2) that this "emotional intimacy," together with the support Clauder gave her, spurred the development of their eventual "physical intimacy"; and (3) discussing her feelings of dependence on "emotional support and direction" Clauder was providing to her, which eventually came to a belief that his support would cease if she terminated their sexual relationship.

further proceedings on that issue. In all other respects, we affirm.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.