**CITY COMMUNICATIONS, INC., a Michigan corporation, Plaintiff,**

v.

**CITY OF DETROIT, a Municipal corporation; Barden Cablevision of Detroit, Inc.; a Michigan corporation; and Maclean-Hunter Cable TV, Inc., a Canadian corporation, Defendants.**

No. 86–CV–71087–DT.

United States District Court, E.D. Michigan, S.D.

May 28, 1987.

Schnader, Harrison, Segal & Lewis by Peter S. Greenberg, Louis W. David, Philadelphia, Pa., Butzel, Long, Gust, Klein & Van Zile by William M. Saxton, Edward Kronk, Detroit, Mich., for plaintiff; Hyde & Mercer by William R. Hyde, Jr., Washington, D.C., of counsel.

Dickinson, Wright, Moon, Van Dusen & Freeman by Fred W. Greeman, W. Gerlad Warren, Elizabeth Trickey, Detroit, Mich., for Barden Cablevision of Detroit, Inc.

Honigman, Miller, Schwartz & Cohn by David A. Ettinger, I.W. Winsten, H.C. Goplerud, Detroit, Mich., for City of Detroit.

William J. DeBiasi, Taylor, Mich., for MacLean-Hunter Cable TV, Inc.

## MEMORANDUM OPINION

GILMORE, District Judge.

On January 22, 1987, this Court issued an opinion in this case granting the defendants' joint motion for summary judgment in part. *City Communications, Inc. v. City of Detroit,* 650 F.Supp. 1570 (E.D. Mich.1987). On March 2, 1987, the private defendants Barden and MacLean-Hunter filed a motion for reconsideration and/or for certification of certain issues for immediate appeal pursuant to 28 U.S.C. § 1292(b). The City of Detroit also filed a motion to certify or reconsider. Those motions are the subject of this opinion.

This suit challenges the legality of the City of Detroit's award to the defendants of an exclusive cable television franchise for Detroit. The facts of this case are set forth in some detail in this Court's opinion of January 22, 1987. The plaintiff is a disappointed bidder for the cable television contract. The claim relevant to this motion is that the City and the successful defendants conspired to violate Sections One and Two of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2. In its January 22 opinion, this Court found that the City of Detroit was immune from any antitrust liability under the "state action doctrine," but that the private defendants, Barden and MacLean-Hunter, could not benefit from the doctrine. It is the latter ruling that the private defendants wish the Court to reconsider.

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that the Sherman Act does not apply to the anticompetitive conduct of a state acting through its legislature. The state action immunity doctrine is based on principles of federalism and state sovereignty, which will not lightly attribute to Congress an intent to "nullify a state's control over its officers and agents." *Parker,* 317 U.S. at 351, 63 S.Ct. at 313; *See* Garland, *Antitrust and State Action: Economic Efficiency and the Political Process,* 96 Yale L.J. 486 (1987). Twenty-five years later, the doctrine was extended to protect municipalities insofar as the municipality acted pursuant to a state policy. *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). The Supreme Court added a second prong to the state immunity doctrine as applied to non-state defendants when it held that the challenged restraint must be " 'actively supervised' by the State itself." *California Retail Liquor Dealers Assn v. Midcal Aluminum Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). Recently, the Court held that a municipality does not have to satisfy the "active supervision" requirement as it is presumed that a municipality acts in the public interest. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Southern Motor Carriers Rate Conference Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).[1] The City of Detroit was dismissed pursuant to this line of cases as the Court found that Detroit acted pursuant to an articulated state policy when it awarded the cable television contract to the defendants.

Where the conduct of a private party is challenged, the private party is presumed to act on its own behalf, *Haillie,* 471 U.S. at 45, 105 S.Ct. at 1722, hence must show that its conduct was actively supervised by the state in order to be protected by the state action doctrine. *Southern Motor,* 471 U.S. at 57, 105 S.Ct. at 1723. Accordingly, this court denied the private defendants' motion for summary judgment, finding that they had not shown active

1. The road an antitrust plaintiff must travel when attacking municipal conduct is not getting easier. Where a municipality unilaterally imposes anticompetitive measures upon the private sector, the action may be dismissed without even reaching the immunity issue unless the plaintiff can show a *per se* violation of the Sherman Act. *Fisher v. City of Berkeley, California,* 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986); *See* Gifford, *The Antitrust State-Action Doctrine After Fisher v. Berkeley,* 39 Vanderbuilt L.Rev. 1257 (1986).

934

supervision by the State of Michigan. *City Communications,* 650 F.Supp. at 1578–79.

The defendants argue that the active state supervision requirement should not be applied to them. They assert that, where a private party is simply regulated by a municipality that is itself immune from antitrust liability and is not the "anticompetitive decision maker," the private party need not be supervised by the state and should benefit from the state action immunity doctrine.

The Court agrees that the state supervision requirement should not be mechanically applied to all private defendants in municipal antitrust actions. However, there are disputed issues of fact as to whether the City of Detroit or the private defendants were the effective decision makers in this case.

The supervision requirement prevents the State from frustrating the national policy in favor of competition by "casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal,* 455 U.S. at 106, 100 S.Ct. at 943. *Midcal* affirmed a state court injunction prohibiting officials from enforcing a statute requiring wine producers to establish resale price schedules. The Court found that the state had simply authorized a price setting and market control mechanism established and operated by private parties, without any regulation of the private anticompetitive behavior by the state. Recently, the Supreme Court again struck down a private price maintenance system that operated with state authorization but without state supervision. *324 Liquor Corp. v. Duffy,* — U.S. —, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987).

Both *Midcal* and *Duffy* involved what have become known as "hybrid" restraints on competition where "nonmarket mechanisms merely enforce private marketing decisions" in which private actors were granted "a degree of private regulatory power." *Fisher v. City of Berkeley, California,* 475 U.S. 260, —, 106 S.Ct. 1045, 1050, 89 L.Ed.2d 206, 213 (1986). In *Fisher,* the Court held that, where there are no private marketing decisions and the municipality

unilaterally imposed noncompetitive rent control measures upon the private sector, the Sherman Act is not even implicated so as to activate the state action immunity doctrine. Rejecting the argument that the rent control ordinance formed a combination between the property owners and the City, the Court held that there was no concerted action within the meaning of the statute simply because the private sector obeyed the regulatory commands of the municipality. *Fisher,* 89 L.Ed.2d at 212–13. *Fisher* distinguished two cases involving "hybrid" regulation, *Midcal, supra,* and *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), stating that those cases involved a large amount of "free participation by private economic actors." *Fisher,* 89 L.Ed.2d at 1050. The Court concluded:

> There may be cases in which what appears to be a state or municipality administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a "gauzy cloak of state involvement." *Midcal, supra,* at 106, 100 S.Ct. at 943. This might occur even where prices are ostensibly under the absolute control of government officials. However, we have been given no indication that such corruption has tainted the rent controls imposed by Berkeley's Ordinance. Adopted by popular initiative, the Ordinance can hardly be viewed as a cloak for any conspiracy among landlords or between the landlords and the municipality.

*Id.* 89 L.Ed.2d at 214.

Once it is determined that the municipality is protected by the state action doctrine, a private party who is merely the beneficiary of the municipality's exercise of power should also be protected. To hold otherwise would allow the *Parker* doctrine to be circumvented by artful pleading: "A plaintiff could frustrate any [protected plan] merely by filing suit against the regulated private parties, rather than the state officials who implement the plan." *Southern Motor Carriers,* 471 U.S. at 56–57, 105 S.Ct. at 1727.

The Sixth Circuit shares this restrictive application of the state supervision requirement. In remanding a case to the district court for determination of whether the defendants' conduct fell within the state action doctrine, the Sixth Circuit held that, if the municipality made the "effective decision" resulting in the challenged conduct, the municipality was protected by the state action doctrine since it acted pursuant to a state policy, and the *entire action* must be dismissed. *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 769 F.2d 324, *rev'd*, 774 F.2d 162 (6th Cir. 1985). *Riverview* then ruled that the claim against the private party could be maintained only if the private party made the "effective decision" that distressed the plaintiff. Only upon a determination that the private party made the effective decision could evidence be taken as to whether the private party was actively supervised by the state. *Id.*, 769 F.2d at 330, 774 F.2d at 163. Other Circuits have also declined to allow plaintiffs to attack municipal decisions through the "back door," holding that private parties are entitled to immunity once the municipality is held to be immune:

> When the [municipal entity] accomplishes its goal in a protected manner, and the participation of private third parties was reasonably contemplated by the legislature, allowing successful tangential attacks on the [municipality's] activities through suits against the [private parties] would effectively block the efforts of the [municipality].

*Cine 42nd Street Theater Corp. v. Nederlander Organization*, 790 F.2d 1032, 1048 (2d Cir.1986); *see Charley's Taxi Radio Dispatch v. Sida of Hawaii*, 810 F.2d 869, 878 (9th Cir.1987).

 This Court agrees with the defendants that, once it is determined that the municipality is entitled to immunity from the antitrust laws, the private parties who are regulated by the municipality are also entitled to immunity as long as the "effective decision maker" is the municipality rather than the private parties. It is precisely on this issue that the Court is faced with a factual dispute. Were the City of Detroit's decisions that permitted the defendants to retain their exclusive cable television franchise made by the City, or did Barden and MacLean have so much influence that the decisions were effectively those of the private defendants?[2] As the Sixth Circuit held in *Riverview*, if the private defendants were the effective decision makers, they will have to demonstrate that they operated under state supervision, while, if the City made the effective decisions, the antitrust claims against the private defendants will have to be dismissed.[3]

The defendants argue that, even if the state supervision requirement applies to them, the supervision by the City of Detroit meets the state supervision requirement. While some courts do permit municipal supervision to meet the state supervision requirement, see *Trinity Ambulance Service, Inc. v. G. & L. Ambulance Service, Inc.*, 625 F.Supp. 142 (D.Conn.1985,) aff'd 787 F.2d 86 (2d Cir.1986); *Vartan v. Harristown Development Corp.*, 655 F.Supp. 430, (N.D.Pa.1987), that is not the law of this circuit. In *Riverview*, the Sixth Circuit expressly held that private parties seeking state action immunity must demonstrate that they have been supervised by the state, not by the municipality. *Riverview*, 774 F.2d at 163.

 The private defendants' final issue in this motion for reconsideration is that

---

2. Of course, the Noerr-Pennington doctrine protects private parties who lobby governments for their own benefit from the antitrust laws. *See Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938 (2d Cir.1987); *Independent Taxi, Etc. v. Greater Houston, Etc.*, 760 F.2d 607 (5th Cir.1985); Garland, *Antitrust and State Action: Economic Efficiency and the Political Process*, 96 Yale L.J. 486 (1987); Wiley, *A Capture Theory of Antitrust Federalism*, 99 Harv.L.Rev. 713 (1986).

3. Whether or not the cable franchise was awarded in strict acceptance with City regulations will not be determinative of this issue. The Sherman Act cannot be used to enforce state or local regulations that can be enforced in state court. *Vartan v. Harristown Development Corp.*, 655 F.Supp 430 (M.D.Pa.1987); Areeda, *Antitrust "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 453 (1981).

this Court erred in holding that disputed issues of fact prevented it from ruling on the applicability of the Local Government Antitrust Act of 1984. 15 U.S.C. §§ 34 *et seq.* This act bars antitrust damages claims against municipalities, and as to private defendants stated:

> No damages, interest on damages, costs or attorney's fees may be recovered under Section 15, 15a, or 15c of this title in any claim against a person based on any official action directed by the local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 36. Legislative history indicates that Congress intended that *Parker* and its progeny should be used to interpret this section. H.Con.Rep. No. 98–1158, 89th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Admin.News 4602, 4627. Accordingly, just as this Court is unable to determine, from the current record, who was the effective decision maker in this case, so disputed issues of fact remain as to whether these private defendants were really acting under official supervision so as to qualify for protection under the Local Government Antitrust Act.

In summary, disputed issues of fact remain as to the applicability of both the state action immunity doctrine and the Local Government Antitrust Act to Barden .and MacLean-Hunter. Accordingly, their motions for reconsideration are denied. As these are factual, not legal issues, these disputes are obviously not ripe for certification for immediate review pursuant to 28 U.S.C. § 1292(b), and that motion is denied as well.

As to the City's motion for reconsideration, Count V of the complaint alleges that the City of Detroit violated the First Amendment by awarding only one cable franchise. The defendants' joint motion for summary judgment argued that the First Amendment claim in Count V, as well as the due process claim in Count IV and the waste claim in Count VI were barred by the doctrine of res judicata. This Court, in its January 22, 1987 opinion, held that the claims were not barred by res judicata. The City of Detroit now moves for recon-

sideration of that issue or for certification of it for interlocutory appeal. The Court finds no palpable defect in its earlier opinion and no proper basis for certification of the issue. Therefore, the City's motion is denied as well.

**WEST ALLIS MEMORIAL HOSPITAL, INC., a Wisconsin non-profit corporation, Plaintiff,**

v.

**Otis BOWEN, in his capacity as Secretary of the United States Department of Health and Human Services, along with his successors, agents, servants, employees and attorneys; Edwin Meese, in his capacity as Attorney General of the United States, along with his successors, agents, servants, employees and attorneys; and St. Luke's Hospital, Inc., a Wisconsin non-profit corporation, along with its officers, agents, servants, employees .and attorneys, Defendants.**

**Civ. A. No. 87–C–0053.**

United States District Court, E.D. Wisconsin.

May 28, 1987.

Robert Friebert, Friebert, Finerty & St. John, S.C., Milwaukee, Wis., for plaintiff.

Melvin Washington, Asst. U.S. Atty., Milwaukee, Wis., for defendants Bowen and Meese.

William Jennaro, Robert Elliott, Cook & Franke, S.C., Milwaukee, Wis., for defendant St. Luke's.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

This case concerns "Freedom 55/65." It has, however, nothing to do with the raging dispute over whether Wisconsin's motorists should have the freedom to drive 65 instead of 55. Instead, it is essentially a tussle between two Milwaukee hospitals over the interpretations to be given to certain provisions of the laws governing Medicare.

*Plaintiff's Motion for Preliminary Injunction*

One of the two hospitals, West Allis Memorial, has filed a motion seeking, in effect, alternative preliminary injunctions against the various defendants. In West Allis's view, the relief it seeks is dependent on the interpretation given to a statute regarding Medicare deductible and coinsurance payments, 42 U.S.C. § 1395nn(b)(2)(B). If I were to determine that the alleged conduct of the second hospital, St. Luke's, is in violation of the statute, then West Allis seeks an injunction preventing St. Luke's from maintaining a program, called "Freedom 55/65," which waives payment of deductible and coinsurance amounts by Medicare beneficiaries, until this lawsuit is concluded or the law is amended to legalize the waiver program. In addition, if St. Luke's is in violation of the statute, West Allis also contends that it is in violation of section 2 of the Sherman Act and section 16 of the Clayton Act, Wisconsin antitrust law, and the common law. On the other hand, if I determine that St. Luke's is not in violation of the statute, West Allis requests that an injunction be issued enjoining the defendants Otis Bowen and Edwin Meese from prosecuting it if it institutes a similar waiver program. In other words, "heads I win; tails you lose," I get an injunction either way. Or, stated another way, if I can't beat 'em, I want to join 'em, albeit in this case, very, very reluctantly.

The standards for the issuance of a preliminary injunction have received a certain amount of attention recently. In *Dynamics Corp. of America v. CTS Corporation*, 794 F.2d 250, 252 (7th Cir.1986), the court stated that:

> [T]he task for a district judge asked to grant a preliminary injunction is to compare the irreparable harm to the plaintiff if the injunction is denied, weighted by the likelihood that the denial would be erroneous because the plaintiff will prevail in the plenary trial, with the irreparable harm to the defendant if the injunction is granted, weighted by the likeli-

hood that the grant would be erroneous because the defendant, not the plaintiff, will prevail in the trial.

The court continued, "If both parties are likely to suffer the same amount of irreparable harm, so far as estimation is possible, then likelihood of success becomes decisive."

■ As the court strives to clarify the standards for granting a preliminary injunction, it becomes clear that the factors are no longer of equal importance and that the factor of first importance is irreparable harm. If irreparable harm exists, then it is weighted by the likelihood of success on the merits. If irreparable harm is great, less of a likelihood of success is required to tip the balance. If irreparable harm exists but is of lesser weight, a greater likelihood of success is required to tip the balance.

■ In this case, I will assume for the moment that the irreparable harm West Allis will suffer if the injunction is not issued is great. However, as will be explained below, there is almost no likelihood that West Allis will succeed on the merits of this lawsuit. In that circumstance, it seems clear that the near absence of one of the factors, even one of lesser importance, must prevent the issuance of an injunction.

West Allis Memorial Hospital is a community hospital which obtains almost half of its total gross patient revenue from Medicare patients. St. Luke's Hospital is a teaching hospital located in close geographical proximity to West Allis. It draws a substantial percentage of its patients, including patients eligible for Medicare benefits, from the same population as West Allis does. Therefore, it is West Allis's contention that the two hospitals are in direct competition with each other for Medicare patients.

On January 1, 1987, St. Luke's instituted its "Freedom 55/65" program, which offers to prospective Medicare patients certain special benefits, the principle of which is a waiver of that portion of their hospital bill that is not covered by Medicare. In other words, the patients at St. Luke's who are enrolled in Medicare are not charged the deductible and coinsurance amounts. The result of such a program, according to West Allis, is that elderly persons on fixed incomes will be attracted to St. Luke's to the detriment of West Allis. To meet this threat, West Allis states that it is prepared to offer a program similar to that being offered by St. Luke's and, by the way, apparently by many other hospitals both in this area and throughout the country. However, West Allis is convinced that to offer a waiver program is to commit a felony under 42 U.S.C. § 1395nn(b)(2)(B). Therefore, the hospital is unwilling to institute a waiver program to meet the threat of competition from St. Luke's without a ruling that the conduct will not be prosecuted. It seemed clear and undisputed at the hearing on the temporary restraining order in this case that what West Allis really wants is to prevent St. Luke's from instituting its waiver program, rather than to be allowed to institute one of its own.

42 U.S.C. § 1395nn(b)(2)(B) provides:

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

. . . .

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this title,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

Attached to the complaint in this action is a letter from Richard P. Kusserow, Inspector General in the Department of Health and Human Services, to Stephen S. Trott, Assistant Attorney General, Criminal Division, Department of Justice in Washington. Kusserow writes that, although it appears that the waiver of the deductible is a technical violation of the statute, for various reasons, including that the waiver incurs no cost to the Medicare program, the Department of Justice should

permit the Department of Health and Human Services to notify hospitals that they will not be prosecuted for offering waivers. He requests this relief pending action by Congress to clarify the statute. In response, Trott wrote to Kusserow, disputing in a mild way some of the points that Kusserow makes and concluding that "[t]he Inspector General has no authority to immunize illegal conduct from prosecution." Trott states:

> We believe it would be highly improper for the Department of Justice to state that certain conduct constituting a crime under the laws of Congress will not be prosecuted. Such a statement would be, in effect, a usurpation of Congress' authority to decide the laws of the land.

Trott, however, goes on to point out that because the Department of Justice does not have resources to prosecute every violation of the criminal code, for reasons of policy no one has been prosecuted for this conduct.

It seems clear, then, that at least two departments of the executive branch of the government suspect that a waiver program is covered by the statute, but neither department feels compelled to take the violation seriously. Despite the positions taken by the government, St. Luke's presents a rather convincing argument that the conduct cannot be covered. St. Luke's argues that a more specific statute than section 1395nn is controlling. That statute is 42 U.S.C. § 1395cc(a)(2)(A), which makes the collection of deductible and coinsurance obligations permissive, rather than mandatory. It seems, in St. Luke's view, contradictory that Congress would make the collection of those amounts permissive while at the same time making the failure to collect them a felony.

Given the ambiguity, West Allis turned to the courts to try to resolve its conflict. Unfortunately for the success of West Allis, the case involves the interrelationship of the three branches of the federal government. The executive branch seems to accept that the statute covers the conduct but, in the exercise of prosecutorial discretion, declines to prosecute and, out of deference to Congress, declines to say that it will not prosecute. The executive branch has turned to Congress, as evidenced by Kusserow's letter, to try to get the statute amended to clarify what conduct is prohibited and what kind of conduct is not prohibited. That process is, however, rather lengthy. In the interim, then, West Allis seeks relief from the courts. However, in the scheme of things, this situation is one on which the courts defer to the other branches of government. The problem is for Congress to solve.

Because the courts have a hands-off policy in this situation, it is unnecessary to determine at the present time whether section 1395nn covers St. Luke's waiver program. It really, in the context of the request for preliminary relief, does not matter. West Allis is unlikely to prevail on the merits of either of its requests. An injunction against St. Luke's, on the one hand, for a possible violation of the statute, or on the other hand against the government, would be equally inappropriate.

Assuming, for the moment, that the statute covers St. Luke's waiver program, what West Allis is asking me to do is to enjoin the commission of a crime. One of the principles of our jurisprudence is that "equity will not enjoin a crime." The principle is not without exceptions; however, the present case is not one which requires that an exception be made. The history of the principle was traced briefly in *Securities and Exchange Commission v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir.1982). There the court stated that early in the development of the common law, equity did enjoin criminal activity. The function of enjoining criminal activity was then taken over by the Star Chamber until that body was abolished by parliament during the reign of Charles I. After the 1640's, the courts withdrew from the business of enjoining criminal activity, and the maxim that "equity will not enjoin a crime" has been with us ever since. In the *Carriba Air* case, the court noted that there were exceptions established during the eighteenth century for public nuisances that were also crimes. And the court went on to find that, in the area of securities law,

by enacting 15 U.S.C. § 77t, Congress had specifically authorized an injunction to prohibit violations. Under those circumstances, the court determined that the commission of a crime could be enjoined. The facts of the case before me are far different and do not require that an exception to the general principle be made. Therefore, a preliminary injunction against St. Luke's for a violation of the statute is denied.

Although the requests brought under the Sherman Act, the Clayton Act, the Wisconsin Antitrust Act, and the Wisconsin common law are on somewhat different footing, they also rely on the fact that St. Luke's is allegedly committing a crime in order to, for instance, attempt to monopolize the market. Accordingly, the request to enjoin St. Luke's actions under those statutes is also denied.

If, on the other hand, one were to assume that there is no violation of the statute, and I think that a reasonable case can be made for that proposition, then West Allis seeks an injunction against the government defendants preventing them from enforcing the statute. In other words, if West Allis institutes a waiver program, it wants assurance that it will not be prosecuted.

This request runs up against another basic doctrine of equity jurisprudence; that is, that the courts should not act to restrain a criminal prosecution, particularly when the moving party has an adequate remedy at law and will not suffer irreparable injury. The anxiety, cost, and inconvenience of having to defend against a criminal prosecution does not constitute irreparable harm. *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977).

Admittedly, this is not a typical case in which a party seeks to enjoin a criminal prosecution. Unlike this case, most of the cases in which a federal court is asked to enjoin a criminal prosecution involve state rather than federal prosecutions and, thus, also involve issues of comity. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Most cases also involve a pending

criminal prosecution, rather than the possibility, however remote, that one might be prosecuted for the violation. However, when no prosecution is likely, another issue, standing, arises. Here, West Allis has only the remotest of chances, as evidenced by the letter from Stephen Trott, of being prosecuted if it institutes a waiver program.

In addition, the cases where courts take seriously a request to enjoin a criminal prosecution are cases in which it is alleged that there is something seriously defective about the statute. Here there is no contention that this statute interferes with any constitutional rights; for instance, there is no contention that it interferes with West Allis's due process rights under the fifth amendment. It is a statute regulating economic activity, presumably under the commerce clause. It is the sort of thing about which courts give great deference to Congress. It differs, then, from cases such as *Penthouse International, Ltd. v. McAuliffe,* 702 F.2d 925, *reh'g,* 717 F.2d 517, *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144, *reh'g denied,* 466 U.S. 994, 104 S.Ct. 2377, 80 L.Ed.2d 849. Even assuming that it somehow is threatened with prosecution and therefore has standing to raise the issue, West Allis does not make any claim that the statute itself is invalid. It simply seeks to have the court substitute its judgment regarding prosecutorial decisions for that of the Department of Justice. It is up to prosecutors to exercise their discretion and to determine who should be prosecuted under valid statutes. If a decision to prosecute is made, the issue of the applicability of the statute to the conduct can be raised in the context of a criminal case.

*Motion for Leave to File a Verified Amended Complaint*

West Allis Memorial Hospital has also filed a motion for leave to file an amended complaint. The request is based on the answer of St. Luke's Hospital, Inc. to the original complaint. In the answer, St. Luke's stated that "St. Luke's Hospital, Inc. and Good Samaritan do not function as a 'single economic unit.'" On the basis of

that answer, West Allis Memorial Hospital seeks to amend its complaint to add a claim based on a violation of section 1 of the Sherman Act. The reasoning is that if St. Luke's and Good Samaritan do not function as a single economic unit, then they can conspire together in restraint of trade under section 1 of the Sherman Act. Although leave has not yet been granted to file the amended complaint, St. Luke's Hospital has filed an answer to the document.

Under Rule 15, leave to amend should be freely granted when justice so requires. The request to file the amendment comes early in this lawsuit, and justice is served by allowing the plaintiff to amend the complaint.

Accordingly, the motion for leave to file a verified amended complaint is granted.

*Plaintiff's Supplemental Motion for Preliminary Injunction*

Based on the amended complaint, West Allis Memorial seeks an injunction against the alleged violation of section 1 of the Sherman Act. The illegal conduct which forms the basis for the Sherman Act claim is the violation of section 1395nn. Accordingly, for the reasons stated in denying the original request for a preliminary injunction, the request is denied.

**Carl E. SPIDLE, Plaintiff**

v.

**COMMONWEALTH OF PENNSYLVANIA, OFFICE OF the BUDGET, et al., Defendants.**

Civ. A. No. 87-0262.

United States District Court, M.D. Pennsylvania.

May 28, 1987.

Kenneth A. Wise, Harrisburg, Pa., for plaintiff.

Gwendolyn T. Mosley and Andrew Gordon, Deputy Atty. Gen., Office of Atty. Gen., Harrisburg, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction And Background*

Defendants, the Commonwealth of Pennsylvania and three of its officials, Ross E. Starner, Comptroller for Public Protection and Recreation, Ann Wildeman, his assistant, and Anna M. Anderson, Supervisor of Budgetary Control for the Comptroller, have moved to dismiss plaintiff's complaint. Plaintiff, Carl E. Spidle, has made claims under Title VII, 42 U.S.C. § 2000e–5(f), The

Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* He has also set forth several pendent state law claims, including a claim under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.* The complaint arises from plaintiff's discharge from employment with the state allegedly as a result of sex and age discrimination. In connection with the Title VII and ADEA claims, plaintiff has alleged that "[a]dministrative remedies have been exhausted." (Complaint, ¶¶ 2 and 4). The individual defendants have been sued in their individual and official capacities.

In their motion and supporting brief, defendants argue that: (1) the eleventh amendment divests this court of jurisdiction to entertain the pendent state claims; (2) the Title VII claim must be dismissed because plaintiff has not adequately alleged that he has satisfied the conditions precedent for filing suit; (3) count II must be dismissed because it makes a claim for sex discrimination under the ADEA when the ADEA does not apply to sex discrimination; and, (4) counts III and IV must be dismissed because the allegations of conspiracy are too vague to satisfy Third Circuit pleading requirements in civil rights actions.

### II. *Discussion.*

A. *The Eleventh Amendment Divests This Court of Jurisdiction to Entertain the Pendent State Claims Against the Commonwealth.*

■ Defendants have cited *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), to support their claim that the eleventh amendment bars us from adjudicating plaintiff's state law claims.[1] In *Penn-*

---

1. The eleventh amendment provides as follows: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

As noted by the Court in *Pennhurst,* the eleventh amendment's greater significance is that it points to the fundamental principle of sovereign immunity which limits the grant of judicial power in Article III of the Constitution. 465 U.S. at 98, 104 S.Ct. at 906, 79 L.Ed.2d at 77. Accordingly, even though the amendment itself is limited to suits against the state by citizens of

another state, it is established that the judicial power of the United States does not extend to

suits against a state by its own citizens.