Nic J. EICHENSEER, Plaintiff,

Brian DOUGHERTY and Eric B. Stener
on behalf of themselves and all other similarly
situated persons, Plaintiffs-Appellants,†

v.

MADISON-DANE COUNTY TAVERN LEAGUE, INC.,
Amy's Cafe, Inc., The Angelic Brewing Company,
LLC, Brothers of Wisconsin, Inc. d/b/a Brothers,
Oscar, Inc. d/b/a Buffalo Wild Wings Grill & Bar,
Bull Feathers, Inc., Zapel, Inc. d/b/a City Bar,
Wisconsin Ventures, Inc. d/b/a Club Amazon and
The Church Key, Kollege Klub, Inc., Schooners
Bar & Grill d/b/a Lava Lounge, The Church Key
d/b/a Mad·Dog's Pub & Pizzeria, B.A.T., Inc.
d/b/a Madhatters, Orbut of State Street, Inc.
d/b/a Mondays, Nitty Gritty, LLC, Paul's Club,
Inc., Plaza Tavern and Grill, Inc., The Pub, Inc.,
The Red Shed, Inc., Spices Restaurante, Inc.,
State Bar & Grill, LLC, State Street Brats,
Stillwaters, Inc., Vintage LLC d/b/a Vintage
Spirits & Grill, Wando Ventures, Inc., The Bull
Ring of Madison, Inc. d/b/a the Irish Pub and
Does 1-50, Defendants-Respondents,

SECURA SUPREME INSURANCE, Intervenor.

Court of Appeals

† Petition for review granted 3/15/07.

495

*No. 2005AP1063. Submitted on briefs February 6, 2006.*
*—Decided October 26, 2006.*

## 2006 WI App 226

(Also reported in 725 N.W.2d 274.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Kay Nord Hunt, Reid R. Lindquist, Brent R. Johnson* and *Steven E. Uhr* of *Lommen, Nelson, Cole & Stageberg, P.A.*, Minneapolis, MN.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Kevin J. O'Connor* and *Kendall W. Harrison* of *LaFollette Godfrey & Kahn*, Madison; *David L. Mandell* of *Mandell & Ginsburg Law*, Madison; *Alan G. B. Kim, Jr.,* of *Davis &*

*Kuelthau*, Madison; and *George B. Strother* of *Krekeler Strother, S.C.*, Madison.

A nonparty brief was filed by *Eric J. Wilson*, assistant attorney general, *Peggy A. Lautenschlager*, attorney general, and *Nancy K. Lynch* of the *University Legal Counsel, University of Wisconsin-Madison*.

Before Lundsten, P.J., Deininger and Higginbotham, JJ.

¶ 1. DEININGER, J. Two University of Wisconsin-Madison students and a third plaintiff commenced this class action suit for injunctive relief and damages against twenty-four campus-area taverns and the Madison-Dane County Tavern League, Inc. They alleged that the defendants had engaged in an illegal conspiracy in restraint of trade by voluntarily agreeing to limit "drink specials" on Friday and Saturday nights after 8:00 p.m. The circuit court granted summary judgment to the defendants and dismissed the action. The plaintiffs appeal, claiming the circuit court erred in concluding that the tavern owners are not liable for antitrust violations because they agreed to limit drink specials in response to City of Madison regulatory initiatives. We reject the claim of error and affirm the appealed order.

## BACKGROUND

¶ 2. The complaint recites that plaintiffs Brian Dougherty and Nic Eichenseer are University of Wisconsin-Madison (UW) students and that plaintiff Eric Stener resides in Janesville.[1] They commenced this

---

[1] After the plaintiffs filed this appeal but before it was briefed, plaintiff Nic Eichenseer requested that he "be dismissed

action on behalf of themselves and as representatives of a class consisting of persons "who have purchased alcoholic beverages from one or more of the defendant drinking establishments since September 12, 2002 on a Friday night after 8:00 p.m. and/or a Saturday night after 8:00 p.m." The defendants ("the Taverns") moved for summary judgment, seeking dismissal of the action on several grounds. Dougherty opposed the motion and cross-moved for summary judgment.

¶ 3. Dougherty does not contend that disputed issues of material fact preclude summary judgment. Because both parties moved for summary judgment and neither argues that factual disputes bar the other's motion, the " 'practical effect is that the facts are stipulated and only issues of law are before us.' " *See Lucas v. Godfrey*, 161 Wis. 2d 51, 57, 467 N.W.2d 180 (Ct. App. 1991) (citation omitted). In its written summary judgment decision, the circuit court described the factual background that follows as the "undisputed evidentiary facts in the record." All footnotes are the circuit court's:

> In 1999, the City of Madison began to address issues of high-risk drinking. The city's concerns were that alcohol and over-consumption issues seemed to be increasing in the campus area, leading to more frequent life-threatening conveyances to detoxification facilities and the great consumption of expensive police response services to the campus area . . . .
>
> About the same time, the UW began to involve itself actively in the City's decisions on issuing retail liquor licenses in the campus area. The University's

as a party and class representative." Accordingly, we refer to the appellants in this opinion collectively as "Dougherty."

view was that drink specials[2] encouraged high-risk, high-volume drinking. The University had received a grant from the Robert Wood Foundation to fund multi-year research, political action and monitoring efforts to try to reduce binge drinking in the campus area. Under pressure from the University, the City began to flex its regulatory muscle by imposing the so-called "Luther's Blues conditions" requested by UW officials on virtually all liquor licenses issued to new or relocating liquor establishments in the campus area. These conditions did not either limit or set prices, but rather appear to be designed to discourage price reduction "specials" that city official believed encouraged high-volume and dangerous drinking.[3] The city committee charged with making recommendations on liquor licenses was the Alcohol License Review Committee (ALRC), chaired for many years by Alderman Tim Bruer. ALRC's recommendations regarding whether licenses should or should not be granted and the various conditions that should be attached to those licenses were so powerful that they were almost inevitably followed by the City Council. ALRC and its chairman Ald. Bruer functioned

---

[2] "Drink specials" appears to be a term of art in this record referring to advertised promotions offering either (1) special, high-potency drinks containing multiple shots of liquor or (2) multiple drinks for the price of one regular drink.

[3] The "Luther's Blues" conditions requested by the UW and imposed by the City include the following:

- Not to increase the volume contained in a serving without increasing proportionately the price charged for such serving.

- Not to give away any drink or sell at a price that is different from the usual price for the drink for any period of time less than one full week.

- Not to give away any drink or reduce the price of any drink conditioned upon the purchase of any drink or number of drinks.

- Not to sell or give away an unlimited number of drinks during a set period of time for a fixed price.

500

as the powerful face and voice of the City's formal and informal regulation of alcohol sold in the City of Madison.[4]

While the "Luther's Blues" conditions were termed "voluntary," they were in fact required at the time by the ALRC and the City for new and relocated liquor licenses to be granted. This new policy of the City also extended to existing licensees, who faced substantial pressure from ALRC to limit drink specials.[5]

In the summer of 2001, the ALRC created a "Sub-Committee on Comprehensive Alcohol Issues" to continue its efforts to address problems associated with high-risk drinking, including life-threatening detox conveyances and other frequent, high risk and expen-

---

[4] Madison General Ordinances, section 3.56(3) vests the ALRC with the following powers and duties: The Alcohol License Review Committee shall be charged with the responsibility and duty to review and examine all applications for the granting of all fermented malt beverage licenses, intoxicating liquor licenses, and operator's licenses, to receive all recommendations relating thereto from staff personnel and *to review and make recommendations as to the subsequent granting of all such licenses by the Common Council,* and be further charged with the responsibility and duty to view the triennial "Alcohol License Problem Report" submitted by the Chief of Police and *may conduct such additional review of problems reported therein with the licenses affected and make such further recommendations or take such further action as they may deem appropriate.* The committee is further charged with providing a reason to the Common Council whenever the committee recommends that a new Chapter 38 license or permit not be approved. [Emphasis by the circuit court.]

[5] Existing taverns such as Regent Street Retreat and Buck's had Luther's Blues conditions imposed on their license renewals at the time they made changes to their businesses. The Nitty Gritty was threatened with similar restrictions at the time of a planned expansion.

sive calls for police services. The subcommittee held public hearings at which the UW, tavern owners and the public stated their views on drink specials and other drinking issues. The subcommittee's final report recommended that ALRC recommend *inter alia* an ordinance regulating drink specials. That report issued on April 25, 2002 contains draft ordinance language banning all drink specials at all Madison taverns seven days a week after 8:00 P.M. The subcommittee report was accepted by the ALRC, which referred the report to the City Council, which also accepted the report. Once received by the council, the recommendations went back to the ALRC for the development of possible ordinance language incorporating the recommendations for a citywide drink special ban.

Madison taverns and the downtown business community opposed this report and the concept of a drink special ban, because the bar owners felt the ban was overbroad and that drink specials contributed little to high-risk drinking behavior on campus. Notwithstanding the opposition to the report, it was adopted by the ALRC at a meeting on May 21, 2002.

On July 10, 2002, the ALRC held a meeting at the UW Memorial Union, at which UW Chancellor John Wiley expressed his strong support for a comprehensive drink special ban. Richard Lyshek, campus tavern owner and Barbara Mercer, the President of the Dane County Tavern League, continued to express opposition. At the end of the meeting, ALRC Chair Bruer told Richard Lyshek and Barbara Mercer that he believed there were sufficient votes on the City Council to pass an ordinance banning drink specials. Bruer specifically directed Lyshek and the Tavern League to come up with a solution to the City's drink special concerns and explained that if they didn't the City would take care of the issue itself. Lyshek and Mercer spoke with one another about the need to respond to the City's regulatory demands on drink specials. Lyshek offered to

coordinate outreach to the bar owners in the campus area on the subject of a tavern owners' response to the direct pressure being brought to bear on the industry to self-regulate drink specials.

Around the same time, Alderman Mike Verveer, who represented most of the campus area and ALRC Chair Bruer had numerous meetings and discussions with Lyshek (also a member of ALRC) and others concerning the City's developing policy against drink specials. Despite opposition of tavern owners to any type of ban on drink specials, Bruer told Lyshek and Barbara Mercer that the bars needed [to] come up with their own solutions to the excessive drinking problems caused by drink specials or the City would do it for them. ALRC member Lyshek believed that any bar that did not take steps to address the City's concerns on drink specials would be subject to increased police scrutiny and would have difficulties with the ALRC at the time of liquor license renewal.

As a result of Lyshek's outreach efforts among campus bar owners, Lyshek identified a number of bar owners willing to announce that they would "voluntarily" discontinue drink specials on Friday and Saturday nights after 8 P.M. in order to see whether that would prevent the City from enacting a seven-day-a-week drink special ban. Lyshek presented the idea to Ald. Verveer, who agreed that it might be acceptable to the City. Lyshek also spoke directly about this approach with ALRC Chair Bruer, who reportedly liked the idea as well.

A press conference was organized for September 12, 2002, at which various downtown bar owners would announce that they were acceding to the City's regulatory demands by voluntarily not offering drink specials on Friday and Saturday nights after 8:00 P.M. Several days prior to the press conference, ALRC Chair Bruer contacted Lyshek and asked whether any of the bars

503

would extend the voluntary discontinuance of drink special[s] to Thursday nights.[6] Lyshek told Bruer that he did not think any bars would be willing to do that.

On September 12, 2002, various bar owners, flanked by Alder Verveer and UW representatives, announced they were giving in to the City's demands and would not offer drink specials on Friday and Saturday nights after 8:00 P.M. When asked whether drink specials could be discontinued on Thursday night, Lyshek explained that there should be one busy night of the week, Thursday, as a "control," to test whether the absence of drink specials really had any effect on problems associated with high-risk drinking. The September 12, 2002, press conference was designed to signal tavern owners' compliance with the City's regulatory demands and policies. It was also political puffery in an effort to get maximum press exposure making the reported group of cooperating bar owners look as large as possible—all designed to have the maximum political impact on ALRC and the City, so that no further steps to enact an omnibus citywide drink special ban would appear to be necessary.[7] The Tavern League of Dane County simultaneously issued a supportive press release, but specifically reserved the rights of individual tavern owners to determine their own participation based on their independent business needs.

The press conference and press releases had their desired effect: at the next ALRC meeting, the committee placed its previously stated intent to draft and

---

[6] These reported statements of ALRC Chair Bruer are cited by the court as "verbal acts" and are not regarded for their truth. These statements are therefore not hearsay and may be considered by the Court on the parties' motions for summary judgment.

[7] Names of bars who simply didn't object to Lyshek's proposal for a voluntary drink special ban, and names of bars Lyshek knew had never offered drink specials on Friday and Saturday nights were included in the list of participating bars.

pursue a citywide drink special ban ordinance on hold. At approximately six-month intervals, the ALRC received detailed reports from University officials active in monitoring campus drinking issues. These reports tracked detox runs and the utilization of police services in the campus area.

¶ 4. Based on the foregoing "undisputed facts," the circuit court granted the Taverns' motion for summary judgment, denied Dougherty's cross-motion and entered an order dismissing the action. Dougherty appeals.

## ANALYSIS

¶ 5. We review the circuit court's grant of summary judgment de novo, applying the same standards as did the circuit court. *See Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 232–33, 568 N.W.2d 31 (Ct. App. 1997). Summary judgment is proper when the pleadings, answers, admissions and affidavits show no genuine issues of material fact and the moving party (or the opposing party) is entitled to judgment as a matter of law. *See* Wis. Stat. § 802.08(2) & (6) (2003–04);[8] *Maynard v. Port Publ'ns, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980). We will reverse a decision granting summary judgment if the trial court incorrectly decided legal issues or if material facts are in dispute. *Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993).

¶ 6. Dougherty bases his claims for damages and injunctive relief on his allegation that the Taverns (whom he labels in his complaint "the Madison Bar

---

[8] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

Cartel"), in agreeing to eliminate drink specials on Friday and Saturday nights after 8:00 p.m., violated the provisions of WIS. STAT. § 133.03(1) which prohibits "conspirac[ies] in restraint of trade." He claims the circuit court erred in concluding that, because the agreement was prompted by the City of Madison's "regulatory pressure," it did not violate state antitrust laws. Dougherty acknowledges "that the state can displace competition with regulation and require or authorize private conduct that would otherwise violate the state antitrust laws," but he contends the legislature has *not* "impliedly repealed" the antitrust law with respect to the retail sale of alcohol drinks. This is so, according to Dougherty, because nothing in WIS. STAT. ch. 125 authorizes Wisconsin municipalities to regulate or control beverage prices or to authorize private taverns to engage in anticompetitive conduct.

¶ 7. The Taverns respond by noting that, under both Wisconsin and federal antitrust law, it is well-established that a municipality may engage in or foster anticompetitive conduct that would otherwise be prohibited under WIS. STAT. ch. 133, provided the legislature "intended to allow municipalities to undertake such actions." *See Town of Hallie v. City of Chippewa Falls*, 105 Wis. 2d 533, 539, 314 N.W.2d 321 (1982). The Taverns contend that the extensive authority the legislature has granted municipalities under WIS. STAT. ch. 125 to regulate the sale and consumption of alcohol beverages shows that the legislature has "impliedly repealed" its antitrust prohibitions with regard to the sale of alcohol drinks in taverns. In the Taverns' view, because their agreement to eliminate drink specials on Fridays and Saturdays after 8:00 p.m. came in direct response to the City's exercise of its legitimate regula-

506

tory authority over tavern operations, the Taverns cannot be held liable for any violations of ch. 133 the agreement may entail. We agree.

¶ 8. The supreme court has described the methodology for determining whether the "implied repeal" doctrine immunizes participants in an anti-competitive arrangement from liability for their actions under WIS. STAT. ch. 133:

> The ... question is whether the legislature has impliedly authorized an exception from the antitrust laws in respect to certain types of conduct ... [, i.e.,] whether there is any evidence extraneous to the antitrust statutes that indicates the legislature did not intend their application.
>
> In *Town of Hallie*, this court looked to other statutory enactments to conclude that the legislature did not intend to curtail the City of Chippewa Falls' ability to [engage in certain anticompetitive conduct] . . . .
>
> Following that same methodology, we examine some of the legislation extraneous to the antitrust statute that might guide us in determining legislative intent. Is there evidence that can reasonably lead to the conclusion that the legislature would consider an anticompetitive ordinance ... reasonable and not violative of the antitrust statutes?
>
> With this purpose in mind, we look to other statutes to determine whether the legislature contemplated the type of anticompetitive activity engaged in by the City . . . .

*American Med. Transp. of Wis., Inc. v. Curtis-Universal, Inc.*, 154 Wis. 2d 135, 148–49, 452 N.W.2d 575 (1990).

¶ 9. Accordingly, we turn to the "other statutes" on which the Taverns rely for proof that the legislature "contemplated the type of anticompetitive activity" in this case (i.e., eliminating or limiting the Taverns' use of "drink specials"). Our goal is to determine whether the legislature "has impliedly authorized an exception from the antitrust laws in respect to" this particular regulatory activity regarding the sale of alcohol beverages. *See id.* We conclude that it has.

¶ 10. The Wisconsin Supreme Court has long recognized that a unit of government may exercise its police power to regulate alcohol sales:

> The justification for the exercise of the police power in restraining or prohibiting the sale of intoxicating liquors has been stated and restated by the courts time and again. It may be summed up as resting upon the fundamental principle that society has an inherent right to protect itself; that the preservation of law and order is paramount to the rights of individuals or property in manufacturing or selling intoxicating liquors; that the sobriety, health, peace, comfort, and happiness of society demand reasonable regulation, if not entire prohibition, of the liquor traffic. Unrestricted, it leads to drunkenness, poverty, lawlessness, vice, and crime of almost every description. Against this result society has the inherent right to protect itself—a right which antedates all constitutions and written laws—a right which springs out of the very foundations upon which the social organism rests; a right which needs no other justification for its existence or exercise than that it is reasonably necessary in order to promote the general welfare of the state.

*Odelberg v. City of Kenosha*, 20 Wis. 2d 346, 350, 122 N.W.2d 435 (1963) (quoting *Zodrow v. State*, 154 Wis. 551, 555, 143 N.W. 693 (1913)).

¶ 11. To address the concerns cited by the court in *Odelberg*, the state legislature has directed that taverns be extensively regulated. The bulk of the state's regulatory statutes relating to the sale of alcohol beverages are contained in WIS. STAT. ch. 125, where, in addition to enacting specific statewide restrictions and requirements regarding the retail sale of alcohol beverages, the legislature has also granted municipalities broad authority to do likewise. *See, e.g.,* WIS. STAT. § 125.10(1) ("Any municipality may enact regulations incorporating any part of this chapter and may prescribe additional regulations for the sale of alcohol beverages, not in conflict with this chapter."). Among the most important powers granted to municipalities is the power to issue licenses for the retail sale of alcohol beverages, to impose conditions on licensees and to revoke licenses for violations of these conditions. *See, e.g.,* WIS. STAT. §§ 125.04; 125.09(1); 125.12(2).

¶ 12. There can be little question that the legislature intends state and local regulation to supplant competition in the retail sale of alcohol beverages, given that many of the provisions in WIS. STAT. ch. 125 are overtly anticompetitive and are themselves "restraints on trade." *See, e.g.,* WIS. STAT. §§ 125.05 (authorizing local referenda to prohibit all sales of alcohol beverages within a municipality), and 125.51(4) (imposing quotas on the number of "Class B" (tavern) licenses that a municipality may issue). We are thus satisfied that "the legislature contemplated the type of anticompetitive activity engaged in by the City," *American Med. Transp.,* 154 Wis. 2d at 149, that is at issue in this case—the elimination or limitation of the use of "drink specials" by campus-area taverns.

¶ 13. Dougherty argues, however, that, although the state legislature has empowered municipalities to

license and regulate taverns, nothing in WIS. STAT. ch. 125 evinces a legislative intent to override WIS. STAT. ch. 133 by permitting municipalities to "control retail alcohol prices." He posits that the City's goal was to "reduce the consumption of alcohol by persons of legal drinking age," and the legislature has enacted two means of accomplishing that goal: a prohibition against serving alcohol to intoxicated persons, WIS. STAT. § 125.07(2); and the imposition of excise taxes on alcohol beverages, WIS. STAT. ch. 139. Because the state could foster reduced consumption of alcohol beverages in Wisconsin by simply increasing the excise taxes it imposes, Dougherty contends that the legislature did not contemplate or intend that a municipality may reduce consumption by "controlling prices," which is how Dougherty characterizes the City's efforts to limit the use of drink specials in the downtown and campus areas.

¶ 14. In support of his contention, Dougherty cites *American Medical Transport*, asserting that here, as in that case, a city has engaged in an anticompetitive activity that finds no statutory basis for exemption from the provisions of WIS. STAT. ch. 133. Dougherty points specifically to the supreme court's statement in *American Medical Transport* that "[t]he antitrust law manifestly indicates a legislative intent to subordinate the city's home-rule authority to its provisions." *American Med. Transp.*, 154 Wis. 2d at 148. We conclude, however, that the analysis in *American Medical Transport* on which Dougherty relies does not address the present facts.

¶ 15. The Taverns do not claim that the City of Madison's authority to regulate "drink specials" flows from its general home-rule powers, but from the legislature's express grant in WIS. STAT. ch. 125 of authority to municipalities to regulate the retail sale of

alcohol beverages. It was the absence of a separate and specific grant of authority evincing a legislative intent to supplant competition with regulation that led the court to reach a result in *American Medical Transport* opposite to that which we reach in this case. *See id.* at 149–52. As we have described, ch. 125 contemplates— and expressly directs—that regulation is to supersede competition in the retail sale of alcohol beverages in Wisconsin.

■

¶ 16. In sum, we concur with the circuit court judge, who concluded in a well-written and well-reasoned summary judgment decision as follows: "Call it what you will (implied repeal, home rule, state action), when a Wisconsin municipality acts out of public health and safety concerns in its regulation of alcohol sales, antitrust and anticompetitive policies are swept away by the fundamental and near-plenary nature of the governmental authority exercised."

¶ 17. Dougherty next argues that, even if the City of Madison was empowered under WIS. STAT. ch. 125 to limit or eliminate drink specials, there is no dispute that the City did *not* do so. In Dougherty's view, the Taverns cannot find shelter for their voluntary anticompetitive conduct in the absence of a duly-enacted city rule or regulation limiting their use of drink specials.

¶ 18. Dougherty is correct that the City of Madison did not enact a rule or ordinance eliminating drink specials on Fridays and Saturdays after 8:00 p.m. He is also correct that the agreement at issue was an admittedly voluntary action on the Taverns' part. Dougherty does not dispute, however, that the Taverns announced their agreement to eliminate drink specials at the specified times only in response to a City official's

request, a request that was coupled with the threat of more extensive limitations on drink specials if the Taverns did not act. He also does not dispute that the official in question, ALRC Chairperson Bruer, was so positioned as to be able to accomplish the enactment of the threatened regulations. Dougherty's claim is that Bruer's request and threats are not enough to make the Taverns' agreement the equivalent of a city regulation. He contends the only way that drink special limitations could be achieved in a way that does not implicate WIS. STAT. ch. 133 would have been for the City to act directly on the issue. We disagree.

¶ 19. We conclude that the Taverns' agreement, made in response to the City's "regulatory pressure," to do voluntarily what the City could well have ordered them to do, and expressly threatened it would order them to do, is entitled to the same exemption from the provisions of WIS. STAT. ch. 133 that would apply if drink specials had been limited directly by way of a City ordinance. To explain why, we turn to federal precedents discussing the "state action" doctrine as a defense against alleged violations of federal antitrust laws. Although the federal "state action" doctrine and the "implied repeal" doctrine discussed in *Town of Hallie* and *American Medical Transport* have distinct conceptual underpinnings,[9] for either defense to be available

---

[9] The exemption from federal antitrust law for anticompetitive conduct instigated by "state action" addresses the interaction of arguably inconsistent enactments of two sovereigns, the state and federal governments, and it implicates notions of federalism as embodied in the Tenth and Eleventh Amendments to the U.S. Constitution. *See Town of Hallie v. City of Chippewa Falls*, 105 Wis. 2d 533, 537, 314 N.W.2d 321 (1982). The "implied repeal" defense against an alleged violation of

to immunize otherwise anticompetitive conduct, the conduct at issue cannot be purely that of private actors but must result from a legitimate exercise of state-granted regulatory authority. *See Town of Hallie*, 105 Wis. 2d at 538–39. We may seek guidance from federal precedents, which "may, . . . in many cases, be instructive and persuasive," in analyzing Wisconsin antitrust law. *American Med. Transp.*, 154 Wis. 2d at 152.

¶ 20. Federal case law makes clear that anticompetitive actions or agreements voluntarily undertaken by private entities can qualify for antitrust immunity if the private conduct is prompted or motivated by governmental regulatory authority and intent. The U.S. Supreme Court has explained that:

> [w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement.

*Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 47 (1985). The federal courts have thus developed a requirement that there be a showing that privately pursued anticompetitive conduct is under the "active supervision" of a government regulatory authority before the private entity may avail itself of the antitrust exemption for a state-regulated activity. *See, e.g., F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 634–35 (1992)

---

Wisconsin's antitrust laws, on the other hand, addresses the interaction of arguably inconsistent enactments of a single sovereign, the state, and it involves a determination of whether, for a given activity, the legislature intends its antitrust prohibitions to apply, or whether it instead intends the activity to be regulated even though anticompetitive effects will result. *See id.* at 537–38.

("[T]he purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties."); *City of Eau Claire*, 471 U.S. at 46 ("[T]he requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy.").

¶ 21. Lower federal courts have explained that the "active supervision" inquiry does not necessarily focus on the level of government supervision or monitoring of a private entity's anticompetitive activity. Rather, the dispositive question will often be: whose "plan" or "scheme" underlies or motivates the private activity in question—that of a government regulator designed to serve the regulatory purpose, or that of a private party in pursuit of private interests? The Seventh Circuit has explained that "for the private actor to be exempt the state must have 'made [his] conduct its own.' " *Hardy v. City Optical Inc.*, 39 F.3d 765, 768 (7th Cir. 1994) (citing *Patrick v. Burget,* 486 U.S. 94, 106 (1988)). The court noted further in *Hardy* that a government regulatory authority "can . . . make conduct its own without requiring it." *Id.*; *see also City Commc'ns, Inc. v. City of Detroit*, 660 F. Supp. 932, 935 (E.D. Mich. 1987) ("[O]nce it is determined that the municipality is entitled to immunity from the antitrust laws, the private parties who are regulated by the municipality are also entitled to immunity as long as the 'effective decision maker' is the municipality rather than the private parties.").

¶ 22. We have no difficulty concluding on the undisputed facts before us that the City of Madison was

the "effective decision maker" with respect to the Taverns' agreement to forego drink specials on Fridays and Saturdays after 8:00 p.m. The Taverns' private conduct was therefore pursued under the City's "active supervision," and the conduct thus qualifies for exemption from the antitrust provisions of Wis. Stat. ch. 133.

¶ 23. At the conclusion of his argument that the implied repeal doctrine does not immunize the conduct at issue, Dougherty seems to dispute what the circuit court deemed to be an undisputed fact—that the Taverns entered into their drink special limitation agreement only in response to the City's "regulatory pressure."[10] He does so by parsing the words that ALRC Chairman Bruer used in describing his communications to the Taverns regarding his desire for voluntary action on their part. Dougherty is apparently attempting to persuade us that the City was *not* the "effective decision maker" behind the Taverns' agreement to "fix prices," which is how he characterizes the agreement to limit drink specials on weekends. We reject this argument.

¶ 24. Although Alderman Bruer may have chosen his words carefully to avoid saying that his communications were meant to encourage the Taverns to "fix prices," there is no dispute that: (1) the matter to be addressed, either by voluntary action or City regulation, was the elimination or limitation of "drink specials"; and (2) Alderman Bruer both requested the Taverns to come up with a voluntary plan of action on

---

[10] After detailing in its written decision the facts of record that established the "enormous" regulatory pressure the City brought to bear on the Taverns regarding drink specials, the circuit court summarized as follows: "The conclusion from this scenario, is that *but for* the intense demands of the City [brought] through its ALRC, there would have been no voluntary ban on weekend drink specials by campus bar owners."

drink specials and threatened them with City regulatory action if they did not. Moreover, we note again that in neither this court nor the circuit court has Dougherty expressly asserted the existence of disputed material facts that would preclude summary judgment. Accordingly, we reject any suggestion by Dougherty that the record raises any factual dispute regarding the cause-and-effect relationship between the City's "regulatory pressure" and the Taverns' drink special limitation agreement of September 12, 2002.

¶ 25. The parties also discuss the *Noerr-Pennington*[11] doctrine, which the circuit court cited as an alternative ground for dismissing Dougherty's action. The *Noerr-Pennington* doctrine, developed in federal antitrust cases, serves "to protect the citizens' right to free speech and to petition government." *See American Med. Transp.*, 154 Wis. 2d at 154. Given that we conclude the Taverns' conduct in this case is not actionable because the legislature has impliedly repealed antitrust provisions in favor of a municipally-enforced regulatory scheme for the sale of alcohol beverages, we do not address whether the *Noerr-Pennington* doctrine might also require the same result. Similarly, we do not discuss whether the "Local Government Antitrust Act," 15 U.S.C. § 35(a), has any role to play in this litigation, as the Taverns contended in the circuit court but do not argue on appeal.

¶ 26. Finally, Dougherty asks us to "grant [his] motion to strike statements that violate [Wis. Stat. §] 802.08(3)." This request is based on Dougherty's assertion that certain statements in affidavits filed by

[11] *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965), and *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

the Taverns in support of their motion for summary judgment violate the requirement that averments in support of or opposition to summary judgment "shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence." Section 802.08(3). Dougherty argues that the court erred by relying on statements contained in the affidavits that he claims purported to relate "the state of mind of persons other than the affiants."

■

¶ 27. We agree, of course, that affidavits or portions thereof that do not comply with WIS. STAT. § 802.08(3) must be disregarded when determining whether a motion for summary judgment should be granted. *See L.L.N. v. Clauder*, 203 Wis. 2d 570, 596, 552 N.W.2d 879 (Ct. App. 1996), *rev'd in part on other grounds*, 209 Wis. 2d 674, 563 N.W.2d 434 (1997). Regardless of whether the circuit court relied on the challenged statements, our review is de novo and we do not rely on them in concluding that the Taverns are entitled to judgment as a matter of law for the reasons we have discussed. There are ample undisputed facts in the record, not objected to by Dougherty, that support our conclusion. Moreover, we agree with the Taverns that the statements in question would likely be admissible if testified to by the affiants at trial.[12]

---

[12] The four statements Dougherty cites in his brief as examples of inadmissible opinions or hearsay are these:

(1) The Tavern League President's statement that the "actions taken by the Tavern League or the other defendants with regard to these issues has been in an effort to comply with the City's health and safety concerns and not for any commercial purpose."

## CONCLUSION

¶ 28. For the reasons stated above, we affirm the circuit court's order denying Dougherty's motion for summary judgment, granting summary judgment to the Taverns and dismissing this action.

*By the Court.*—Order affirmed.

(2) A Tavern owner's statement that "local tavern owners are particularly sensitive to both formal and informal changes in the regulatory policies pursued by the City of Madison."

(3) Alderman Bruer's statement that "Madison taverns and the downtown business community opposed the Sub-Committee's recommendations because they believed that the proposed ban was over-broad and that drink specials contributed little to high-risk drinking and its effects."

(4) Alderman Verveer's statement that the Tavern League and tavern owners, "[b]elieving that a city-wide, seven-day drink special ban was imminent, ... considered what additional steps they could take to head off a total ban on nighttime drink specials."

To the extent that the statements in question constituted opinions of the affiant, the affidavits provided ample foundational facts to support those opinions. *See* WIS. STAT. RULE 907.01. To the extent that the statements contain what is apparently hearsay, they could easily have been rephrased to reflect the affiant's own belief or opinion. In short, were this case to be tried, we have little doubt that the Taverns would be able to introduce the substance of what is contained in the challenged statements by way of testimony from the affiants.